UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CHAUDRY S. BADAR, ALIA DAVARIAR, :
MUHAMMAD SHAFQAT, BALQEES BADAR :
and BILAL BADAR, :
 :
                        Plaintiffs, :
 : **MEMORANDUM AND ORDER**
           -against- : 18-cv-06390 (DLI) (SMG)
 :
SWISSPORT USA, INC. and PAKISTAN :
INTERNATIONAL AIRLINES, :
 :
                      Defendants. :
------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

      Plaintiffs Chaudry S. Badar, Alia Davariar, Muhammad Shafqat, Balqees Badar and Bilal Badar (collectively, "Plaintiffs"), family members of decedent Nauman Badar, bring this action against Defendants Swissport USA, Inc. ("Swissport") and Pakistan International Airlines ("PIA") (collectively, "Defendants"), arising from Defendants' alleged mishandling and misplacement of Nauman Badar's remains. *See*, Am. Compl., Dkt. Entry No. 14. Before the Court are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Plaintiffs' motion to strike affirmative defenses pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Defendants move for summary judgment on the grounds that the Montreal Convention exclusively governs the rights and liabilities of the parties to this action and, in the alternative, that there is insufficient evidence to support Plaintiffs' state law claims. *See*, Defs.' Mem. in Supp. of Mot. for S.J. ("Defs.' S.J. Mem."), Dkt. Entry No. 38. Plaintiffs move for partial summary judgment on the issue of liability as to their state law claims and to strike Defendants' affirmative defenses under the Montreal Convention. *See*, Mem. in. Supp of Pls.' Mot. for S.J. ("Pls.' S.J. Mem."), Dkt. Entry No. 44 Ex. 2.

For the reasons set forth below, Plaintiffs' motion to strike Defendant's affirmative defenses is denied. Plaintiffs' motion for partial summary judgment as to Defendant's liability for state law claims and Defendants' motion for summary judgment based on the Montreal Convention's preemption of state law claims are denied because the evidence currently in the record is inconclusive and precludes the Court from determining the threshold question as to whether the Montreal Convention exclusively governs the claims in this matter. An evidentiary hearing to determine this issue shall be scheduled.

## BACKGROUND

### I.  Factual Background

The following facts are undisputed unless otherwise stated. All factual disputes are resolved, and all reasonable inferences are drawn, against the party whose motion is under consideration. On October 25, 2017, Nauman Badar (the "decedent") passed away unexpectedly at his apartment in Astoria, New York. Plaintiffs, the brothers, sister and parents of the decedent, decided to bury the decedent's body in Pakistan. Bilal Badar hired Muslim Funeral Services ("MFS") to collect the decedent's remains from the medical examiner's office, prepare the remains for burial, and arrange their transportation from New York to Pakistan. MFS arranged with PIA to transport the decedent's remains from New York's John F. Kennedy International Airport ("JFK") to Pakistan on PIA Flight 712 on October 28, 2017. Bilal Badar also was scheduled to travel to Pakistan on Flight 712, which was PIA's last scheduled flight to or from the United States, as they were no longer offering that service moving forward.

On October 28, 2017, PIA's cargo handling agent received the decedent's remains from MFS and transported the remains to the aircraft site and to Swissport, a company that provides cargo handling services. However, the decedent's remains, along with another set of remains,

mistakenly were not loaded onto Flight 712. Instead, the remains were left on the tarmac, without climate control. When Bilal Badar arrived in Pakistan the following day, he learned that the remains had not been transported as scheduled. PIA representatives could not confirm their location at that time. Approximately 8-10 hours after the remains originally were scheduled to arrive in Pakistan, Plaintiffs were informed that they had been located at JFK. The remains were returned to MFS for storage. On November 1, 2017, MFS drove the remains to Maryland where decedent was buried. Notably, Arbab Hibutallah, PIA's Local Manager for North America, testified that the other set of remains left stranded at JFK ultimately were transported to Pakistan.

On November 9, 2018, pursuant to 28 U.S.C. § 1441(d), PIA removed this action from the Supreme Court of the State of New York, Queens County, to this Court on the basis that PIA is a "foreign state" or "agency or instrumentality of a foreign state" as defined by 28 U.S.C.§ 1603(b). On January 8, 2019, Plaintiffs filed the Amended Complaint. Am. Compl., Dkt. Entry No. 14. The Amended Complaint alleges causes of action for loss of sepulcher, negligence, gross negligence, negligence per se, negligent infliction of emotional distress, fraud, loss of services and breach of contract against PIA, Swissport and the Port Authority of New York and New Jersey ("Port Authority"). *Id.* Prior to the filing of the instant motions, the parties stipulated to the voluntary dismissal of the Port Authority, with prejudice. *See*, Stipulation, Dkt. Entry No. 32. In opposing Defendants' motion for summary judgment, Plaintiffs abandoned their claims for fraud and loss of services. *See*, Pls.' Opp'n to Defs.' Mot. for S.J. ("Pls.' Opp'n"), Dkt. Entry No. 40 at 3.

## II.     The Montreal Convention

The Convention for the Unification of Certain Rules for International Carriage by Air, known as the Montreal Convention, governs the uniform system of liability for international air carriers. *See*, *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004). "The Montreal

3

Convention 'unifie[d] and replace[d] the system of liability that derives' from the Warsaw Convention, many provisions of the conventions are similar, and courts continue to evaluate provisions of the Montreal Convention using 'cases interpreting equivalent provisions in the Warsaw Convention.'" *LAM Wholesale, LLC v. United Airlines, Inc.*, 2019 WL 1439098, at *2 n.2 (E.D.N.Y. Mar. 31, 2019) (alteration in original) (quoting *Hunter v. Deutsche Lufthansa AG*, 863 F. Supp.2d 190, 205 (E.D.N.Y. 2012)); *See also*, *Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc.*, 42 F. Supp.3d 436 (E.D.N.Y. 2014), *aff'd*, 621 F. App'x. 82 (2d Cir. 2015) (summary order) ("[T]he Court may rely on precedent interpreting the Warsaw Convention's parallel provisions when addressing claims under the Montreal Convention" (citation omitted)).

The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward." Montreal Convention, Art I(1), May 28, 1999 (entered into force on Nov. 4, 2003) reprinted in S. Treaty Doc. No. 106–45, 1999 WL 33292734 (2000). "*[I]nternational carriage* means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated . . . within the territories of two States Parties." *Id.*, Art. 1(2) (emphasis in original).

The primary goal of the Montreal Convention is to "limit airline accident liability while protecting the rights of passengers and shippers utilizing international air carriage." *Seagate Logistics, Inc. v. Angel Kiss, Inc.*, 699 F. Supp.2d 499, 505 (E.D.N.Y. 2010). To that end, the Montreal Convention preempts state and federal claims that fall within its scope. *See*, *Best v. BWIA West Indies Airways Ltd.*, 581 F. Supp.2d 359, 362 (E.D.N.Y. 2008) ("By its own terms, the treaty, where applicable, preempts the remedies of a signatory's domestic law, whether or not the

4

application of the [Montreal] Convention will result in recovery in a particular case." (citing *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 161 (1999))).

## LEGAL STANDARD

### I.     Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations omitted). "When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011) (citation omitted).

A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party may not rely on "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Instead, the nonmoving party must affirmatively set out facts showing a genuine issue for trial. *Anderson*, 477 U.S. at 248. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). When considering cross-motions for summary judgment, a

court "need not enter a judgment for either party." *Padberg v. McGrath–McKechnie*, 203 F. Supp.2d 261, 274 (E.D.N.Y. 2002)).

## II.     Motion to Strike Affirmative Defenses

Rule 12(f) of the Federal Rules of Civil Procedure allows courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "A motion to strike an affirmative defense under Rule 12(f) . . . for legal insufficiency is not favored." *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984), *vacated on other grounds*, 478 U.S. 1015 (1986)). As a result, such a motion "will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Id.*; *See also*, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[C]ourts should not tamper with the pleadings unless there is a strong reason for so doing." (citations omitted)).

"Three prerequisites must be satisfied before a court may grant a motion to strike defenses." *F.D.I.C. v. Pelletreau & Pelletreau*, 965 F. Supp. 381, 389 (E.D.N.Y. 1997). A plaintiff must show that: "(1) there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *In re Beacon Assocs. Litig.*, 2011 WL 3586129, at *1 (S.D.N.Y. Aug. 11, 2011) (citation omitted).

## DISCUSSION

While the Court considers each parties' motion on its own merits, it notes that the cross-motions raise overlapping issues. Each motion concerns the applicability of the Montreal Convention to the instant dispute, specifically: (1) whether the Montreal Convention applies to the international transportation of human remains, and, if it does, (2) whether the Montreal Convention

6

preempts Plaintiffs' state law claims. The motions each also concern the viability of Plaintiffs' state law claims.

I.     **Plaintiffs' Motion to Strike Affirmative Defenses**

As threshold matter, the Court must determine whether the Montreal Convention, which by its terms applies to the international transportation of "persons, baggage or cargo," applies to the international transportation of human remains. In support of their position that the Convention does not apply to human remains, Plaintiffs rely on to *Tarar v. Pakistan Int'l Airlines*, 554 F. Supp. 471 (S.D. Tex. 1982), as well as statements by Defendants' representatives that they do not treat human remains as ordinary cargo. *See*, Pls.' S.J. Mem. at 14-17.[1]

In *Tarar*, the plaintiffs contracted with defendant PIA to transport their relative's remains from the United States to Pakistan. 554 F. Supp. at 473-74. As a result of PIA's "negligent and wrongful acts and omissions," the remains arrived in Pakistan more than four days later than they originally were scheduled to arrive. *Id.* at 477-78. Appearing to rely on the testimony of PIA's agents "that PIA does not consider human remains to be ordinary commercial goods," the *Tarar* court found, without meaningful elaboration, that "human remains are not 'persons, baggage, or goods' within the meaning of Article 1(1) of the Warsaw Convention." *Id.* at 478. Whereupon, the court concluded that the Warsaw Convention was inapplicable, but nonetheless proceeded to analyze whether the willful nature of PIA's conduct exempted it from the Warsaw Convention's limitations on liability. *Id.* at 478-79.

Defendants, relying on decisions from the U.S. Courts of Appeals for the Ninth and Third Circuits, respond that the weight of authority holds that human remains are "goods" within the meaning of the Warsaw Convention, and, thus, the Montreal Convention applies to the

---

[1] Plaintiffs' memorandum in support of its motion for summary judgment does not contain page numbers. Accordingly, the Court has utilized the numbers assigned by the ECF system.

7

international transportation of human remains.  *See*, Defs.' Opp'n at 4.  In *Johnson v. American Airlines, Inc.*, 834 F.2d 721 (9th Cir. 1987), the Ninth Circuit, in reviewing *Tarar*, concluded that "[n]o case has squarely addressed the issue [of] whether human remains are 'goods' for purposes of the Convention:"

> "Dictum in [*Tarar*, 554 F. Supp. at 478], stated that human remains were not 'goods' for purposes of the Convention. *Id.*  The court, however, noted only that both parties agreed that human remains were not 'goods.'  The court agreed with the parties without explaining why it did so.  Moreover, whether or not the court agreed with the parties had no bearing on the ultimate resolution of the case.  Under these circumstances, *Tarar*'s value as precedent is limited, and we decline to rely on it."

*Johnson*, 834 F.2d at 723 n.2.

Turning to the text of the Warsaw Convention, the Ninth Circuit interpreted Article 1, which "provides that the Convention applies 'to *all* international air transportation of passengers, baggage, and goods performed by aircraft for hire,'" "to mean that the Convention applies to *all* cases in which an aircraft is hired to transport someone or something on an international route."  *Id.* at 723 (emphasis in original).  The court cautioned that, to "interpret the Convention in any other way would leave airlines unprotected by the Convention when they are hired to transport things that are not readily viewed as 'passengers,' 'baggage,' or 'goods,'" reasoning that the "signatories to the Convention would not have intended such a result." *Id.*  Accordingly, the court held that human remains must be treated as "goods" for purposes of the Warsaw Convention. *Id.*

In *Onyeanusi v. Pan Am*, 952 F.2d 788 (3d Cir. 1992), the Third Circuit noted that it was facing the "exact issue" the Ninth Circuit addressed in *Johnson*, that is, whether human remains are "goods" for the purposes of the Warsaw Convention.  *See*, *Onyeanusi*, 952 F.2d at 790-91.  Like the Ninth Circuit in *Johnson*, the Third Circuit in *Onyeanusi* expressed its disapproval of *Tarar*.  *See*, *Onyeanusi*, 952 F.2d at 791 ("Given the seemingly contradictory conclusions of *Tarar*,

8

we find it to be of limited precedential value."). The court examined the meaning of "goods," noting that human remains can have significant commercial value, despite not typically being bought and sold like other goods. *Onyeanusi*, 952 F.2d at 792. Ultimately, the court found that a narrow reading of the term "goods" would frustrate the broad purposes of the Warsaw Convention, as "[t]o exclude human remains from the definitions of 'goods' would exempt a significant number of claims from the Convention, thus exposing air carriers to inestimable liability." *Id.* at 792-93. The Third Circuit thus agreed with the Ninth Circuit that human remains must be treated as "goods" for purposes of the Warsaw Convention. *Id.*

Plaintiffs attempt to distinguish *Johnson* and *Onyeanusi*, noting that the air waybill in *Johnson*, which contained the terms of the contract to ship the decedent's remains, labeled the remains as "goods." Plaintiffs also point to the statement in *Johnson* that "[o]nly if the funeral home had opted to declare an excess value for the remains could the plaintiffs expect to have the shipment treated as other than 'goods.'" *See*, *Johnson*, 834 F.2d at 723-24. Plaintiffs contend that, by contrast, here there was no analogous provision in the air waybill, and, thus, "[P]laintiffs had every reason to expect that the shipment of Nauman's body would be treated as other than 'goods.'" *See*, Pls.' S.J. Mem. at 16; Pls.' Opp'n at 12.

As an initial matter, *Tarar* was decided by a court of concurrent jurisdiction from a different circuit and, as such, is not binding precedent here. At best, it can be persuasive. However, as discussed by the Ninth Circuit in *Johnson* and the Third Circuit in *Onyeanusi*, *Tarar*'s value as precedent is limited given that court's lack of analysis. Like the Third and Ninth Circuits, this Court is not persuaded by the holding in *Tarar* and declines to follow it.

Moreover, Plaintiffs' arguments incorrectly focus on the labels affixed to the cargo, and the parties' supposed beliefs, rather than on the text of the Convention. Notably, the Ninth Circuit,

9

independent of, and prior to, its discussion of the label on the air waybill, reached the conclusion that the signatories to the Warsaw Convention intended the term "goods" to include human remains. *See*, *Johnson*, 834 F.2d at 723. In any event, the air waybill for decedent's remains here contained both a Notice Concerning Carrier's Limitation of Liability and PIA's Conditions of Contract, each of which provide that the Montreal Convention may apply in the event of loss of, damage or delay to the cargo. Accordingly, Plaintiffs should have known that the shipment of the decedent's remains would be subject to the Montreal Convention.

Finally, the subjective expectations of the parties, such as the testimony of one of PIA's employees that PIA does not treat human remains as "ordinary cargo," does not control over the text of the Montreal Convention, particularly as the Convention "is to be so construed as to further its purposes to the greatest extent possible." *See*, *Benjamins v. British European Airways*, 572 F.2d 913, 918 (2d Cir. 1978).

Plaintiffs also rely on a statement in the *Onyeanusi* lower court opinion that there was "no evidence that [defendant] Pan Am considered human remains to be an extraordinary shipment or that it had adopted a casket handling policy in which a higher than ordinary degree of care would prevail." *Onyeanusi v. Pan Am. World Airways, Inc.*, 767 F. Supp. 654, 657 (E.D. Pa. 1990), *aff'd sub nom.*, *Onyeanusi v. Pan Am*, 952 F.2d 788 (3d Cir. 1992). Plaintiffs' reliance is misplaced. This statement by the district court was made in the context of discussing why the reasoning in *Tarar* "is not cogent." *Onyeanusi*, 767 F. Supp. at 656. Moreover, the Third Circuit's opinion did not include or address this statement and, as discussed above, focused instead on the meaning of the term "goods," and the broad purposes of the Convention, in concluding that human remains constituted "goods" as used in Article 1(1) of the Warsaw Convention.

10

The Court concurs with the Ninth and Third Circuits that the broader interpretation of the term "goods" to include human remains is a correct reading of Article 1(1) of the Warsaw Convention. However, the issue before the Court differs from that confronted in *Johnson*, *Onyeanusi* and *Tarar*, as the language "persons, baggage, or goods" in the Warsaw Convention was modified to read "persons, baggage or *cargo*" in the Montreal Convention. Thus, the Court must determine whether human remains are "cargo" within the meaning of the Montreal Convention.

"When interpreting a treaty, [courts] begin with the text of the treaty and the context in which the written words are used." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699 (1988) (quotation marks and citations omitted); *See also*, *Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1027 (2d Cir. 1996) ("Our interpretation of the Warsaw Convention must begin 'with the literal language.'" (quoting *Buonocore v. Trans World Airlines*, 900 F.2d 8, 9 (2d Cir. 1990))). "Other general rules of construction may be brought to bear on difficult or ambiguous passages." *Schlunk*, 486 U.S. at 700. "If the words of the [treaty] are reasonably susceptible of only one interpretation, [the court's] task of interpretation ends there." *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 375 (2d Cir. 2004) (internal quotations and citations omitted).

Beginning with the text of the treaty, while the Montreal Convention itself does not define "cargo," the term is generally defined to encompass any load conveyed by a vessel. *See, e.g.*, *Black's Law Dictionary* (11th ed. 2019) (defining "cargo" as "the load of a vessel; the goods, merchandise, or whatever is conveyed in a ship or merchant vessel"); *Oxford English Dictionary* (defining "cargo" as "[t]he freight or lading of a ship, a ship-load."). "Cargo" is thus broader than "goods," and the inclusion of "cargo" in the Montreal Convention illustrates the signatories' intention to preserve the expansive interpretation of the Convention's scope. *See, e.g.*, Montreal

11

Convention, Ltr. of Transmittal, 1999 WL 33292734, at *2 (characterizing the Montreal Convention as, "with respect to cargo, preserv[ing] all of the significant advances achieved by [the Warsaw Convention as amended by Montreal Protocol No. 4].")"; Montreal Convention, Explanatory Note, 1999 WL 33292734, at *11 (describing Article 1(1) of the Convention as "essentially unchanged").

As discussed above, the Court concurs with the reasoning of the Ninth and Third Circuit's that human remains are "goods" within the meaning of the Warsaw Convention. Thus, as the term "cargo" is broader than, and inclusive of, the term "goods," the Court finds that the Montreal Convention similarly applies to the international transportation of human remains. Accordingly, Plaintiffs' motion to strike Defendants' affirmative defenses under the Montreal Convention is denied.

## II. Whether the Montreal Convention Exclusively Governs the Rights and Liabilities of the Parties

Having determined that the Montreal Convention applies to the international transportation of human remains, the Court considers next whether the Montreal Convention exclusively governs the rights and liabilities of the parties to this action, as Defendants contend in their motion for summary judgment.

Article 29 of the Montreal Convention provides:

> "In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights."

Montreal Convention, Art. 29, 1999 WL 33292734, at *38. Thus, "the Montreal Convention preempts state and federal claims that fall within its scope." *LAM Wholesale, LLC*, 2019 WL 1439098, at *2; *Cf.*, *Fishman v. Delta Air Lines, Inc.*, 132 F.3d 138, 141 (2d Cir. 1998) (holding

12

that under the Warsaw Convention, "[a]ll state law claims that fall within the scope of the Convention are preempted'). Put another way, where one of the Convention's damage provisions applies, "the Convention provides the sole cause of action under which a claimant may seek redress for his injuries." *Seagate Logistics, Inc. v. Angel Kiss, Inc.*, 699 F. Supp.2d 499, 505 (E.D.N.Y. 2010) (quoting *Weiss v. El Al Israel Airlines, Ltd.*, 433 F. Supp.2d 361, 365 (S.D.N.Y. 2006)).

As relevant here, one of the Montreal Convention's damages provisions, Article 19, provides, that "[t]he carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo." Art. 19, 1999 WL 33292734, at *35. It is undisputed that Plaintiffs' claims involve the international shipment of the decedent's remains with a departure in the United States and a destination in Pakistan, and that each country is a party to the Montreal Convention. The parties further agree that complete non-performance of a contract falls outside of the scope of Article 19. *See, e.g.*, Defs.' Mem. at 10; Pls.' S.J. Mem. at 14; *See also*, *Oparaji v. Virgin Atl. Airways, Ltd.*, 2006 WL 2708034, at *4 (E.D.N.Y. Sept. 19, 2006), *aff'd*, 258 F. App'x 374 (2d Cir. 2007) ("The history of the Warsaw Convention indicates that the drafters of the Convention did not intend the word 'delay' in Article 19 to extend to claims . . . that arise from the total nonperformance of a contract." (quotation marks and citation omitted)). Accordingly, the issue before the Court is whether there was complete non-performance of the contract, or instead, as Defendants contend, a delay in the carriage of cargo. The Court finds that an evidentiary hearing is required prior to it making this legal determination.

Courts have held that a plaintiff's decision to secure substitute travel constitutes a delay in the carriage of passengers, baggage or cargo, and, thus, remains subject to Article 19. *See, e.g.*, *Paradis v. Ghana Airways, Ltd.*, 348 F. Supp.2d 106, 114 (S.D.N.Y. 2004)), *aff'd*, 194 F. App'x 5 (2d Cir. 2006) (summary order) (collecting cases). In *Paradis*, defendant Ghana Airways

13

canceled a flight on which plaintiff was scheduled to travel. 348 F. Supp.2d at 108. Ghana Airways's staff informed plaintiff that he should make arrangements with their office for alternate travel. *Id.* Plaintiff "feared being stranded if they spent their remaining cash on accommodations while waiting for Ghana Airways' next flight, scheduled for the following Friday, to leave, especially because they did not have guaranteed seats," and purchased a return ticket on another airline. *Id.* at 109. Plaintiff thereafter sued Ghana Airways for breach of contract, arguing "that his state law claim withstands the preemptive effect of the Conventions because he sues for non-performance of contract rather than for delay." *See*, *Id.*

The *Paradis* court held that "plaintiff fail[ed] to state a claim for relief that escapes the preemptive effect of [Article 19 of] the [Warsaw Convention and Montreal Convention]," as "a passenger cannot convert a mere delay into contractual non-performance by choosing to obtain more punctual conveyance." *Id.* at 112. The Second Circuit "affirmed the judgment essentially for the reasons stated in the opinion of the district court." *Paradis*, 194 F. App'x at 6; *See also*, *Oparaji v. Virgin Atl. Airways, Ltd.*, 2006 WL 2708034, at *4 (E.D.N.Y. Sept. 19, 2006), *aff'd*, 258 F. App'x 374 (2d Cir. 2007) ("As in *Paradis*, [plaintiff] Oparaji's claim for damages occasioned by his missed flight are within the scope of Article 19; however, Oparaji's decision to secure substitute travel does not expose [defendant] Virgin Atlantic to liability under that article.").

In contrast, where a defendant fails to perform its obligation and fails to offer alternate transportation, a plaintiff's claims are not subject to the preemptive effect of Article 19. In *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp.2d 447 (E.D.N.Y. 2007), for example, defendant World Airways, Inc. ceased operations between Nigeria and the United States, canceling future flights and stranding passengers who had flown already the outbound legs of their round trips. *Id.* at 450. The court found that plaintiffs' claims were not preempted by Article 19 of the

Warsaw Convention, because "plaintiffs have shown that World [Airways, Inc.] simply refused to fly them, without offering alternate transportation." *Id.* at 454.

Here, it remains unclear whether Plaintiffs chose to secure substitute travel for the decedent's remains or whether Defendants offered alternate transportation for the remains. Throughout their briefing, Defendants assert that Plaintiffs "demand[ed] the return of the decedent's remains," and that "[i]t was plaintiffs' decision to retrieve the remains from PIA and make alternate transportation arrangements." *See, e.g.*, Defs.' Mem. at 8. However, the evidence cited by Defendants in their briefing does not support these assertions. *See*, *Id.* (citing Bilal Badar Dep., Dkt. Entry No. 44 Ex. 9, Tr. 51:12-15; Hibutallah Aff. ¶ 6). For example, in deposition testimony repeatedly cited by Defendants, Bilal Badar was asked, "Why were your brother's remains buried in Maryland," and he answered, "The decision kind of came down to where it will be closest to family." Bilal Badar Dep., Dkt. Entry No. 44 Ex. 9, Tr. 51:12-15. Viewing the cited testimony in the light most favorable to Plaintiffs, Bilal Badar's statement does not refer to the decision to retrieve the remains from Defendants, but rather the decision as to where to bury the remains once burial in Pakistan became impossible.

Defendants rely also on the testimony of Arbab Hibutallah, PIA's Local Manager for North America that, sometime after the decedent's remains "did not travel as scheduled on Flight 712," he "was subsequently informed that the Badar family decided not to transport the decedent's remains to Pakistan, but rather intended to have a burial in the United States." *See*, Hibutallah Aff. ¶¶ 5-6. As with Bilal Badar, Hibutallah's affidavit could be read as referring to the decision made by the family about where to bury the remains after PIA refused to fly them, particularly as Flight 712 was PIA's last flight out of the United States. While not cited in Defendants' briefing, Arbab Hibutallah testified at his deposition that "Mr. Badar had advised that his brother's body

15

should not be shipped to Pakistan as he was coming back, and he had decided by that time to bring him to USA." *See*, Dep. of Arbab Hibutallah, Dkt. Entry No. 36, Defs.' Rule 56.1 Stmt. Ex. 5, Tr. 68:16-69:5. However, there also is evidence in the record that, after the decedent's remains were located on the tarmac, they were returned by Defendants to MFS "for storage." *See*, Pls.' S.J. Mem. at 9 & Ex. 15. Accordingly, the evidence in the record as to why and under what circumstances the remains were returned to MFS may shed light on whether there was delay or contractual non-performance by Defendants, a fact essential to determining the preemptive effect of Article 19 of the Montreal Convention.

Moreover, Plaintiffs contend that neither PIA nor Swissport gave the Badar family the option of sending the decedent's remains to Pakistan after the remains were found at JFK. *See*, Opp'n at 9. Plaintiffs testified accordingly: Bilal Badar testified that the only communication he received from PIA after the decedent's body was located was a call he received from PIA a few days after the burial, which he described as, "I'm with PIA, this is what happened, that's pretty much it." *See*, Bilal Badar Dep. Tr. 56:2-20. Balquees Badar testified that, after the decedent's remains were located at JFK, she was not aware of anyone from the airline giving the decedent's family the option to transport the remains to Pakistan. *See*, Balquees Badar Dep., Dkt. Entry No. 41 Ex. 2, Tr. 35:15-36:6. Finally, when Chaudhry Badar was asked whether the family was given the option to transport the decedent's remains to Pakistan, he stated, "there was nobody from PIA there. The operation of airline had stopped? That was the last flight, and there was no one there to deal with." *See*, Chaudry Badar Dep., Dkt. Entry No. 41 Ex. 1, Tr. 33:20-34:5.

The evidence does not support Defendants' assertions that Plaintiffs "demanded" the return of the remains to them and whether Plaintiffs did or did not make such a demand also is unclear. Moreover, Plaintiffs' testimony could support a finding that there was no offer of alternate

transportation by Defendants. Also unclear is whether Defendants returned the remains to MFS for storage for the purpose of arranging alternate transportation for them.

On this record, there is insufficient evidence to enable the Court to decide the legal question of whether the Montreal Convention exclusively governs the rights and liabilities of the parties. Thus, an evidentiary hearing is required to develop the necessary facts to determine this threshold issue and the cross-motions for summary judgment are denied.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion to strike affirmative defenses is denied. The parties' cross-motions for summary judgment are denied without prejudice pending the Court's determination as to whether the Montreal Convention exclusively applies to the claims in this case. No later than November 1, 2020, the parties jointly shall submit a letter proposing dates on which the parties are available for an evidentiary hearing on the issue of whether the Montreal Convention exclusively governs the claims in this matter and outlining any documentary evidence they seek to introduce and witnesses they intend to have testify at the hearing with a very brief summary of their anticipated testimony.

SO ORDERED.

DATED:    Brooklyn, New York
              September 30, 2020

_____/s/_____
DORA L. IRIZARRY
United States District Judge